# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**ORIGINAL**

THYSSENKRUPP FABCO CORP.,
*an Ontario Corporation,*

<em>Plaintiff,</em>

v.

FABRISTEEL PRODUCTS, INC.,
*an Michigan corporation,*

<em>Defendant.</em>

JUDGE : Battani, Marianne O.
DECK  : S. Division Civil Deck
DATE  : 10/29/2004 @ 14:43:30
CASE NUMBER : 5:04CV60240
CMP THYSSENKRUPP V. FABRISTEEL
(KC)

Magistrate Majzoub.

---

## THYSSENKRUPP FABCO CORP.'S MOTION FOR PRELIMINARY INJUNCTION COMPELLING FABRISTEEL PRODUCTS, INC. TO PERFORM ITS CONTRACTUAL OBLIGATIONS TO THYSSENKRUPP FABCO

For the reasons stated in the accompanying Brief in Support, Plaintiff ThyssenKrupp Fabco Corp. moves for a preliminary injunction compelling Defendant FabriSteel Products, Inc. to continue to ship specially-engineered automotive parts to Fabco until the end of the terms of the contracts between the parties, or, at minimum, until Fabco can obtain an alternate source of supply.

Respectfully submitted,

BUTZEL LONG

By: _____

Daniel N. Sharkey (P53837)
Eric M. Mathis (P65384)
150 West Jefferson, Suite 100
Detroit, MI 48226
Attorneys for Plaintiff ThyssenKrupp Fabco Inc.

Dated: October 29, 2004
706291

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

THYSSENKRUPP FABCO CORP.,
*an Ontario Corporation,*

      *Plaintiff,*

v.

FABRISTEEL PRODUCTS, INC.,
*an Michigan corporation,*

      *Defendant.*

_____/

Case No. 04- 60240
Hon. Marianne O. Battani
Magistrate Majzoub

Daniel N. Sharkey (P53837)
Eric M. Mathis (P65384)
Butzel Long
Attorneys for Plaintiff
150 West Jefferson, Suite 100
Detroit, MI 48226
313-225-7000

_____/

**FILED**

OCT 2 9 2004

CLERK'S OFFICE, DETROIT-PSG
U.S. DISTRICT COURT

## THYSSENKRUPP FABCO CORP.'S MOTION AND BRIEF IN SUPPORT FOR PRELIMINARY INJUNCTION COMPELLING FABRISTEEL PRODUCTS, INC. TO PERFORM ITS CONTRACTUAL OBLIGATIONS TO THYSSENKRUPP FABCO

     For the reasons stated in the Brief in Support that follows immediately below, Plaintiff ThyssenKrupp Fabco Corp. (Fabco) moves for a preliminary injunction compelling Defendant FabriSteel Products, Inc. (Fabristeel) to continue to ship specially-engineered automotive products to Fabco until the end of the term of the contract between the parties, or, alternatively, until Fabco can obtain an alternate source of supply.

## TABLE OF CONTENTS

INDEX OF AUTHORITIES.....................................................................................................ii

INTRODUCTION...............................................................................................................1

FACTUAL BACKGROUND...............................................................................................3

    **A.**    **The Parties**...........................................................................................3

    **B.**    **The Contract Fixes the Price for the Parts**.................................4

    **C.**    **Fabristeel Demands Price Increases and then Withholds the Parts**............4

    **D.**    **Fabco's Operations Require That It Receive A Continuous and Timely Supply of the Parts from Mercury**.............................................6

ARGUMENT.......................................................................................................................8

    **A.** Summary of Argument.........................................................................8

    **B.** Standard for Injunctive Relief..........................................................9

        **1.**    **Fabco Has a Strong Likelihood of Prevailing on the Merits**........................10

            *a. The UCC Specifically Provides for Specific Performance of Unique Goods*...11

            *b. Higher Raw Material Costs Do Not Constitute a Force Majeure and Therefore Do Not Excuse Fabristeel's Obligation to Perform*...............14

            *c. The UCC Entitles Fabco to Have Time to Find an Alternate Supply*.............15

        **2.**    **Fabco Will Be Irreparably Harmed If An Injunction Is Not Issued**...........................................................................16

        **3.**    **The Injunction Will Preserve The Status Quo And Will Not Injure Mercury**..........................................................18

        **4.**    **Granting The Injunction Is In The Public Interest**.......................19

CONCLUSION ................................................................................................................19

# INDEX OF AUTHORITIES

**Cases**

*Bohnsack v. Detroit Trust Co.,*
    292 Mich. 167; 290 N.W. 367 (1940) ..........................................................11-12

*Continental Teves v. Textron Fastening Systems,*
    Oakland County Circuit Court Case No. 04-056766-CZ ......................................13, 16

*Eastern Airlines, Inc v. Gulf Oil Corp.,*
    415 F. Supp. 429 (S. D. Fla, 1975) ......................................................................... 12

*Delphi Automotive Systems LLC v. Center Manufacturing Inc.,*
    Oakland County Circuit Court Case No. 04-060078-CK...................................11-13, 16

*Delphi Automotive Systems, Inc. v. Central Die Casting and Mfg.,*
    United States District Court for the Eastern District of Michigan, Case No. 01-74034........14

*Gates v. Detroit & Mackinac Ry Co.,*
    151 Mich. 548; 115 N.W. 420 (1908).............................................................. .....9

*Gen Motors Corp. v Paramount Metal Prods Co.,*
    90 Fl Suppl 2d 861 (E. Dl Michl 2000) .................................................................. 18

*Golsen v. ONG Western Inc.,*
    756 P.2d 1209 (Sup. Ct. Okla. 1988) ...............................................................15

*Hughbanks v. Browning,*
    9 Ohio. App. 114 (1917) ....................................................................................... 11

*In re Autostyle Plastics, Inc,*
    216 B. R. 784 (Bankr W. D. Mich., 1997)........................................................ 17-18

*Intertec Systems, L. L. C. v. Multimatic, Inc.,*
    United States District Court for the Eastern District of Michigan, Case No. 04-73661........13

*Intertec Systems, L. L. C. v. NYX, Inc.,*
    Oakland County Circuit Court, Case No. 04-060634-CK.........................................13

*Intier Automotive, Inc. v. Textron Fastening Systems, Inc.,*
    Oakland County Circuit Court, Case No. 04-059492-CK.........................................13

*Jaup v.Olmstead,*
    334 Mich. 614; 55 N.W.2d 119 (1952).................................................................. 11

*Kaiser Trading Co v. Assoc Metals & Minerals Corp.*,
   321 F. Supp. 923 (N. D. Cal, 1970) ................................................................ 12, 19

*Kelsey-Hayes Company v. Galtaco Redlaw Castings Corporation*,
   749 F. Supp. 794 (E. D. Mich. 1990) ............................................................ 17, 18

*Langham-Hill Petroleum Inc v. Southern Fuel Co.*,
   813 F.2d 1327 (4th Cir. 1987) ..............................................................15

*L & L Concession Co v Goldhar-Zimner Theatre Enters, Inc.*,
   332 Mich. 382; 51 N.W.2d 918 (1952) ............................................................ 10

*Laclede Gas Co v. Amoco Oil Co.*,
   522 F.2d 33 (CA 8, 1975) ............................................................................ 12

*Madariaga v. Morris*,
   639 S.W.2d 709 (Tex. Ct. App., 1982) ......................................................... 12

*Millers Cove Energy Co v. Moore*
   62 F.3d 155 (6th Cir. 1995) ...............................................................14-15

*Northern Indiana Pub Serv Co v. Carbon County Coal Co.*,
   799 F.2d 265 (7th Cir. 1986) .............................................................14

*Sandison v. Michigan High School Athletic Ass'n*,
   64 F.3d 1026 (6th Cir. 1995)...............................................................9

*Six Clinics Holding Corp, II v. Cafcomp Sys, Inc.*,
   119 F.3d 393 (CA 6, 1997) ........................................................................ 10

*United Nuclear Corp v Gen Atomic Co.*,
   629 P.2d 231 (N. M., 1980) ........................................................................ 12

*Van Buren Public Sch Dist v Wayne County Circuit Judge*,
   61 Mich. App. 6; 232 N.W.2d 278 (1975) ..................................................... 9

*Welker v City Brewing Co.*,
   11 Ohio. App. 117 (1919) ........................................................................ 11

*Zurn Constructors, Inc v BF Goodrich Co.*,
   685 F. Supp. 1172 (D. Kan., 1988)...............................................................19

**Statutes**

MCL §440.2716................................................................................ 10, 16

MCL § 440.2309................................................................................15-16

**Other Authorities**

Michigan Contract Law § 14.16 ........................................................................................ 12

Uniform Commercial Code (4th Ed), § 3-10 ...................................................................... 12-13

Uniform Commercial Code, § 2-716 ................................................................................... 11

**Rules**

F. R. Civ. P. 65.............................................................................................................20

**BRIEF IN SUPPORT**

<u>**INTRODUCTION**</u>

The ramification of this case are not those often faced by the Court: the imminent shutdown of two large automobile assembly plants.

On Tuesday, October 26, 2004, Fabristeel advised Fabco that it would stop shipping automotive parts to Fabristeel on Monday, November 1, 2004. Absent continued shipments of parts from Fabristeel, Fabco's Ridgetown, Ontario assembly plant will shut down on Wednesday, November 3, and General Motors' Oshawa, Ontario and Doraville, Georgia assembly plants will stop producing the Chevrolet Malibu and Minivan vehicles on Monday, November 8. GM employs thousands of workers at its Oshawa, Ontario and Doraville, Georgia assembly plants and manufactures approximately 417,600 and 208,800 vehicles per year, respectively, a total average of 2,400 vehicles each business day.

Pursuant to various written supply contracts, Fabristeel supplies Fabco with 100% of its requirements for pierce studs, self piercing nuts, self piercing studs, M6 pierce studs and spot buy for tryout (the Parts) at fixed prices. Fabco incorporates the Parts into modplate assemblies for steering columns (the Assemblies) designed for GM. GM immediately incorporates the Assemblies into its Chevrolet Malibu and Minivan vehicles.

Fabristeel is well aware that the supply chain runs on "just-in-time" inventory, and that Fabco relies on Fabristeel's constant shipments of the Parts in order to build the Assemblies. Fabco ships the Assemblies on a just-in-time basis to its customer, GM. Fabristeel has nonetheless threatened to cut off Fabco's supply of the Parts unless Fabco pays Fabristeel's unilateral demand for price increases in excess of 60% more than the fixed prices in the purchase

order between the parties (the Contracts). *See*, **Exhibits A** to the Verified Complaint[1]; **Exhibit B,** Jeff Tessier Affidavit, ¶ 19; *and* **Exhibit D,** Fabristeel's August 16, 2004 letter.

On October 26, Fabristeel informed Fabco that Fabristeel will not send its next shipment of Parts scheduled for Monday, November 1, to Fabco.  If Fabristeel does not resume shipping, Fabco will be unable to obtain an alternative source of supply for its Parts requirements for several months.  Fabco currently possesses only a two-day supply of some of the Parts, and therefore will run out of some of the Parts on Wednesday, November 3, and will be forced to stop making the Assemblies.

Because GM only maintains a few days' worth of the Assemblies, GM's Chevrolet Malibu and Minivan vehicle assembly lines at GM's Oshawa, Ontario and Doraville, Georgia assembly plants could shut down as soon as November 8.  Because of the immediate ripple effect a shutdown of GM's assembly lines would have on the entire supply chain, it will adversely affect the employment of thousands of production workers and the ability of the world's largest automakers to fill orders of new vehicles.  Fabco, GM, and their respective employees and suppliers would suffer severe damage to their goodwill, customer relations and reputation.  The damages that Fabristeel's flagrant breach of contract will inflict will be incalculable.  Fabco's *only* protection against a shutdown is injunctive relief for specific performance.

In this Motion, Fabco asks this Court to enter a preliminary injunction ordering Fabristeel to specifically perform of the Contracts until they expire in November 20, 2008, or at least until Fabco has procured an alternative supplier for the Parts, in order to preserve the status quo and prevent imminent and irreparable damages to Fabco, GM, and their employees, dealers, and suppliers.

---

[1] All Exhibits are attached to the Verified Complaint.

## FACTUAL BACKGROUND

**A.     The Parties**

Fabco is a global supplier of, among other things, medium and heavy metal stampings, modular assemblies, weldments and systems, that it produces for the automotive manufacturers. Fabco's automotive customers include GM and nearly every other major automotive manufacturer worldwide.

Fabristeel is an automotive supply company that builds steel and metal-based products that it supplies to, among others, Fabco.

Since January 27, 1996, Fabristeel has been the sole supplier of the Parts to Fabco. Fabco incorporates the Parts into modplate assemblies for steering columns, defined above as the Assemblies.  Fabco ships the Assemblies nearly every business day to GM.  GM immediately installs the Assemblies in Chevrolet Malibu and Minivan vehicles.  Fabristeel's Parts and Fabco's Assemblies are specifically designed and produced to meet the precise engineering requirements of GM's Chevrolet Malibu and Minivan product programs.

Fabristeel is the sole source of the Parts for Fabco, and Fabco is the sole source of the Assemblies for GM.  As a result of GM's stringent product approval requirements, Fabco cannot easily or readily substitute another supplier for Fabristeel.  To obtain an alternate source of supply for the Parts, Fabco must obtain GM's approval of alternative suppliers and go through its rigorous Production Part Approval Process ("PPAP"), which involves extensive testing and evaluation.   Even when accelerated, the PPAP process can take several months.

**B.     The Contract Fixes the Prices for the Parts**

Fabristeel supplies the Parts to Fabco pursuant to the Contracts. **Exhibit A.**   The Contracts require that Fabco purchase all of its need for the Parts exclusively from Fabristeel and

3

that Fabristeel supply Fabco with those requirements of the Parts, all at an agreed-upon fixed prices pursuant to periodic releases issued by Fabco. **Exhibit A.**

The Contracts became effective January 27, 1996 and remain in effect today. The Contracts do not allow Fabristeel to unilaterally increase the price or impose a "surcharge." Nor do the Contracts permit Fabristeel to do what it has done: stop shipment because Fabco refused to capitulate to Fabristeel's extortionist demands. Even if Fabristeel had some right to terminate the Contracts early, the fixed-price term of the Contracts would remain in effect until Fabco is reasonably able to resource its supply of the Parts to another supplier.

**C.   Fabristeel Demands Price Increases and then Withholds the Parts**

In the spring of 2004, Fabristeel personnel contacted Fabco's buyers claiming that its cost for raw materials had increased to make the Parts, and demanded that Fabco pay a surcharge for each Part. On May 3, 2004, Fabristeel sent Fabco an acknowledgement form stating, "Please acknowledge that your company will accept the recently quoted steel surcharges." **Exhibit C.**

After a series of communications between Fabristeel and Fabco's buyers throughout the summer, on August 16, 2004, Fabristeel sent a letter to Fabco stating the following threat to terminate shipment:

> FabriSteel products will need your immediate acknowledgement of the first surcharge to continue shipping product to your facilities. Without the acknowledgement we will no longer be able to supply product after September 16, 2004.

**Exhibit D.** On August 26, 2004, Fabristeel sent another acknowledgement form for the new quoted surcharges and demanded that Fabco respond by August 31, 2004 in order to proceed with the processing of new orders. **Exhibit E.**

On September 23, 2004, Fabristeel sent a letter to Fabco stating that shipments would not be made after October 4, 2004 unless Fabco agreed to the price increase:

4

> Although we previously communicated with you relative to these out-of-control pricing issues; our current product prices to you do not reflect the increases required to support these rising costs... we must pass these increases along to our customers.

*    *    *

> This signed acknowledgement will serve as approval for FabriSteel to continue shipments of your releases and avoid potential confusion on availability of your products after October 4, 2004. **Exhibit F.**

Fabristeel temporarily relented, but on October 26, 2004, Fabristeel again threatened to stop shipping the Parts to Fabco effective Monday, November 1, 2004 to Fabco. **Exhibit B, ¶ 15.** That same day, October 26, Fabco informed Fabristeel that Fabco would not accept Fabristeel's request for price increases, and requested written assurances from Fabristeel that it would continue to deliver the Parts at the contractually specified prices. **Exhibit G.** Fabco also reminded Fabristeel of its contractual obligations and the disastrous consequences that would result if Fabristeel disrupted its supply of the Parts, including the shutdown of our production facilities and those of our customer, General Motors Corporation, causing irreparable harm to our relationships and millions of dollars in damages. *Id.* Fabco also requested that Fabristeel provide Fabco with written assurance that Fabristeel would continue to supply Fabco's requirements of the Parts at the agreed upon fixed prices until the end of the various Contract terms. **Exhibit B, ¶ 16; Exhibit G.**

Fabristeel provided no such assurance of performance. Fabristeel has simply refused to perform because Fabco refused to change the Contracts' fixed-price terms. For example:

- Fabristeel agreed under the Contracts that the price for part number 11503713 on purchase order number 99017 [**Exhibit A**] would be fixed at $.02635 until November 20, 2008.
  Fabristeel has requested a price of $.04290 [**Exhibit F, p. 2,** requesting price of $42.90 per thousand].
  Thus, Fabristeel's demand is for a 62% increase over the Contract's fixed price.

5

- Purchase order 92170 fixes the price for part number 11503378-PRC-NUT at $.02712 until November 20, 2008. **Exhibit A.**
  Fabristeel has current demanded $.04538. [**Exhibit F**, p. 2, requesting price of $45.38 per thousand], which would represent a 67% increase over the Contract price.

Fabristeel's demand for exorbitant price increases of 62% and 67% are in direct contravention of Fabristeel's long-term agreement with Fabco to supply Fabco's requirements of the Parts at the fixed prices.

The Contracts do not permit Fabristeel to cease supply of the Parts, or to stop supplying the Parts if Fabco does not agree to increase the Contracts' price terms. Nor do the Contracts permit Fabristeel to unilaterally impose price increases because of an increase in the cost of raw materials.

**D.     Fabco's Operations Require That It Receive A Continuous and Timely Supply of the Parts from Fabristeel**

Fabco's manufacturing facilities use the "just-in-time" supply method for the processing of Fabristeel-supplied Parts. The "just-in-time" supply method is standard in the automotive industry and is used by Fabco's customer, GM, as well as other automotive suppliers. Use of the "just-in-time" supply method means that Fabco does not maintain a significant inventory of the Parts. Accordingly, Fabco relies on regular shipments of Fabristeel-supplied Parts in order to meet its production needs.

Fabco's use of the "just-in-time" supply method makes the continuity of Fabco's operations dependent upon its suppliers' uninterrupted delivery of products. Fabristeel is well aware that any interruption in delivery of product from any of Fabco's key suppliers would create serious, adverse ripple effects throughout the operations of Fabco, GM, and their customers, suppliers and employees.

Because Fabristeel is Fabco's only supplier of the Parts and Fabco maintains only approximately a week's supply of the Parts, Fabristeel's supply interruption will cripple or completely shutdown Fabco's production by Wednesday, November 3. In addition, because GM maintains supplies of Fabco's Assemblies that only meet GM's needs for as little as a few days, GM's production will be similarly affected within a few days after Fabco's production is shut down. GM would be forced to shut down its Oshawa, Ontario and Doraville, Georgia assembly lines just days after it runs out of Fabco's Assemblies. GM employs thousands of workers at its Oshawa, Ontario and Doraville, Georgia assembly plants, and its Oshawa, Ontario plant manufactures approximately 1,600 vehicles each business day and its Doraville, Georgia plant manufactures approximately 800 vehicles each business day, an average of 417,600 and 208,800 vehicles per year, respectively. **Exhibit B, ¶¶ 23-26.**

As a result, an interruption of the supply of the Parts will quickly result in dire consequences for thousands of employees of Fabco and GM, causing catastrophic losses, as well as incalculable damage to their customer relations, goodwill and reputations. **Exhibit B, ¶ 27.**

Fabco is entitled to a preliminary injunction ordering specific performance until such time as Fabco can secure an alternative supply because: (a) there is a substantial probability of success on the merits of the claims of Fabco against Fabristeel; (b) Fabco will be irreparably harmed if the injunctive relief is not granted; (c) Fabristeel will not be harmed if the injunctive relief is granted because it would merely be compelled to do that which it has agreed to do; and (d) the public interest would be served by avoiding massive plant shutdowns, potential layoffs and other harm to the local, state and national economy.

# ARGUMENT

## A.   Summary of Argument

Fabco satisfies all four of the traditional factors for mandatory preliminary injunctive relief. First, Fabristeel's threatened interruption of supply constitutes a bad-faith and unjustified material breach of the Contracts. Second, if Fabristeel is allowed to interrupt the critical supply of the Parts, Fabco will be deprived of the Parts that are essential for the manufacture of the Assemblies, and hours later GM will be deprived of the Assemblies that are essential for the manufacture of the Assemblies, which Fabco is required by contract to ship timely to GM. If GM does not receive the Assemblies, it will be forced immediately to cease production of the Chevrolet Malibu and Minivan vehicle programs. Because of the engineering and logistical issues involved in finding an alternative supplier of the Parts, Fabco will be unable to obtain and validate the necessary volume of the Parts for at least several months and perhaps longer.

The injury resulting from a shutdown of GM's Chevrolet Malibu and Minivan assembly lines would adversely affect thousands of employees of Fabco, GM and their suppliers. The damage to customer relations and goodwill of Fabco and GM will be incalculable and irreparable. Because consequential damages, even if somehow calculable, would not be fully compensated at law, injunctive relief is Fabco's *only* available remedy. The balance of harm and public interest, thus, militates in favor of a mandatory injunction requiring Fabristeel to produce and ship the contracted-for Parts in accordance with the Contracts.

This Court should order Fabristeel to do what the Contracts require: ship the Parts to Fabco at the contractually-specified prices. A preliminary injunction will merely prevent Fabristeel from holding the Parts hostage for ransom and allow Fabco to mitigate further damage by finding an alternate supply of the Parts.

8

**B.**   **Standard for Injunctive Relief**

The following four factors should be considered in determining whether to grant a preliminary injunction:

(1)   The likelihood that the party seeking the injunction will prevail on the merits;

(2)   The danger that the party seeking the injunction will suffer irreparable injury if the injunction is not issued;

(3)   The risk that the party seeking the injunction would be harmed more by the absence of an injunction than the opposing party would be by the granting of the relief; and

(4)   The harm to the public interest if the injunction is issued.

*Sandison v. Michigan High School Athletic Ass'n*, 64 F.3d 1026 (6th Cir. 1995). These factors are not prerequisites to issuing an injunction. Rather, they are factors to be balanced. The decision to grant or deny preliminary injunctive relief should be based on the facts of the particular case in question. *Id.*

Courts have recognized two types of preliminary injunctive relief: mandatory injunctive relief and prohibitory injunctive relief. Mandatory injunctive relief requires the non-moving party to undertake an affirmative act. *Gates v. Detroit & Mackinac Railway Co*, 151 Mich. 548, 551; 115 N.W. 420 (1908). An example of mandatory injunctive relief is when a court grants a preliminary injunction that requires specific performance. *Id.* at 552 (affirming a preliminary mandatory injunction directing defendant to deliver logs to plaintiff at the same place where delivery had been made for several consecutive years); *Van Buren Public School District v. Wayne County Circuit Judge, et al*, 61 Mich. App. 6, 20-21; 232 N.W.2d 278 (1975) (affirming a preliminary mandatory injunction directing the school district to insure continued employment of union bus drivers). It is generally recognized that, "whenever courts have found a mandatory injunction essential to the preservation of the status quo and a serious inconvenience and loss

9

would result to Plaintiff and there would be no great loss to Defendant, they will grant [mandatory preliminary injunctive relief]." *L & L Concession Co v. Goldhar-Zimner Theatre Enterprises, Inc.*, 332 Mich. 382, 388; 51 N.W.2d 918 (1952).

In this case, Fabco satisfies all four of the traditional factors for preliminary injunctive relief.

### 1.    Fabco Has a Strong Likelihood of Prevailing on the Merits

The essence of this dispute is Fabco's insistence that Fabristeel live up to commitments under the Contracts by providing the Parts to Fabco at the agreed-upon prices.  Fabristeel's apparent position, that it may unilaterally alter or terminate the Contracts and demand higher prices for the Parts based upon market conditions for raw materials, is devoid of merit, and Fabco is likely to prevail in its action on the underlying dispute.

In demonstrating the likelihood of success, "it is ordinarily sufficient if the Plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Six Clinics Holding Corp., II v. Cafcomp Systems, Inc.*, 119 F.3d 393, 402 (6th Cir. 1997) (*citing In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985). Here, Fabco easily satisfies this test.

#### a.    The UCC Specifically Provides for Specific Performance of Unique Goods

In this Motion and the underlying Verified Complaint, Fabco seeks Fabristeel's specific performance in accordance with the parties' Contracts.  This form of relief is both appropriate and available to Fabco for two reasons.

First, specific performance of requirements contracts like the one in this case is expressly provided for in MCL §440.2716:

> (1)    Specific performance may be decreed where the goods are unique or in other proper circumstances.

(2)    The decree for specific performance may include such terms and conditions as to payment of the price, damages, or other relief as the court may deem just.

The two subsections quoted above were adopted by Michigan without variation from the 1962 official text of the Uniform Commercial Code, §2-716. As explained in Comment 2 to UCC §2-716:

> Output and requirements contracts involving a particular or peculiarly available source or market present today the typical commercial specific performance situation….[U]niqueness is not the sole basis of the remedy under this section for the relief may also be granted "in other proper circumstances" and inability to cover is strong evidence of "other proper circumstances."

Second, Michigan courts have long been willing to order specific performance in cases where damages would not provide an adequate remedy for the harmed party, as in the case of an imminent shutdown of production by Fabco and Ford for months until an alternate supplier can be found and validated. *See, e.g., Jaup v. Olmstead*, 334 Mich. 614, 55 N.W.2d 119 (1952) (specifically enforcing contract for sale of used gas heaters when utility company refused to provide gas service to new customers); *Bohnsack v. Detroit Trust Co*, 292 Mich. 167, 290 N.W. 367 (1940) (ordering specific performance of agreement among shareholders to buy life insurance to benefit surviving shareholders).[2]    As noted by commentators, "[s]pecific performance is particularly appropriate in the modern automotive industry where manufacturers commonly enter into requirements contracts." JOHN R. TRENTACOSTA, MICHIGAN CONTRACT LAW §14.16. *See also*, **Exhibit H**, August 13, 2004, transcript of ruling in *Delphi Automotive Systems, LLC v. Center Manufacturing, Inc.*, Wayne County Circuit Court Case No. 04-060078-

---

[2] *See also Welker v. City Brewing Co*, 11 Ohio. App. 117 (1919) (ordering specific performance of beer requirements contract due to difficulties in covering immediately prior to implementation of prohibition); *Hughbanks v. Browning*, 9 Ohio. App. 114 (1917) (ordering specific performance of tobacco field output contract).

CK, pp. 15-16 (discussing provisions above in context of automotive supply chain dispute over commercial impracticability claim based upon increased steel prices).

A number of federal and state courts in other jurisdictions have made the same determination when considering whether specific performance is warranted where a supply contract is at issue. *See, e.g., Laclede Gas Co v. Amoco Oil Co,* 522 F2d 33 (8th Cir. 1975) (plaintiff entitled to specific performance under propane supply contract where propane was difficult to find in marketplace and parties had long term contract to provide central propane gas distribution systems to residential developments); *Eastern Airlines, Inc v. Gulf Oil Corp,* 415 F. Supp. 429 (S. D. Fla. 1975) (airline entitled to specific performance on requirements contract for oil and airline did not breach agreement by "fuel freighting" during the OPEC boycott); *Kaiser Trading Co v. Assoc Metals & Minerals Corp,* 321 F. Supp. 923 (N. D. Cal 1970) (grounds for specific performance satisfied where contract was for sale of cryolite used in production of aluminum and injunction was ordered because supplies were scarce); *United Nuclear Corp v. General Atomic Co,* 629 P.2d 231 (N. M. 1980) (specific performance granted on public utility's contract for supply of 5 million pounds of uranium where uranium was not necessarily unique, but no other sellers wished to make a long term contract with the buyer); *Madariaga v. Morris,* 639 S.W.2d 709 (Tex. Ct. App. 1982) (business manufacturing hot sauce was required to continue production of sauce to buyer where contract was clear, definite and certain, and hot sauce had unique character).

Indeed, Professors White and Summers observe that a "gale of judicial opinions" reject claims for increased costs as a basis for a finding of commercial impracticability, and conclude that "an increase in price, even a radical increase in price, is the thing that contracts are designed

to protect against." *Uniform Commercial Code*, 4th Ed, § 3-10, pp 170-172 (noting eight additional cases not mentioned above).

Earlier this month, this Court joined this "gale of judicial opinions" by issuing a preliminary injunction in virtually identical circumstances. **Exhibit K**; *Intertec Systems, L. L. C. v. Multimatic, Inc.*, United States District Court for the Eastern District of Michigan, Case No. 04-73661, October 14, 2004, Order Granting Intertec's Motion For Preliminary Injunction (Cleland, J.).

Moreover, the Oakland County Circuit Court has recently made a number of similar rulings.

In August of this year, Judge Goldsmith held a trial in another steel-surcharge case, *Delphi Automotive Systems, LLC v. Center Manufacturing, Inc.*, Wayne County Circuit Court Case No. 04-060078-CK, August 13, 2004, transcript of Court's ruling, **Exhibit H**. Like Fabristeel, Center claimed that its fixed-price contracts to supply steel-based products were commercially impracticable based upon the large increase in steel prices during the first six months of 2004. This Court held:

> The Court does have some sympathy for Center's predicament because of its cost increases that it faces, but the Court believes that while that is significant on a business level, it is not significant on a legal level. These were fixed price contracts.

**Exhibit H**, p. 18.

In *Continental Teves v. Textron Fastening Systems*, Wayne County Circuit Court Case No. 04-056766-CZ, Judge Schnelz entered a Temporary Restraining Order and Order to Show Cause requiring Textron to continue to ship automotive parts to Continental despite Textron's claim of commercial impracticability based upon increased steel costs. **Exhibit I**, March 11, 2004, Order. *See also, Intier Automotive, Inc. v. Textron Fastening Systems, Inc.*, Oakland

13

County Circuit Court, Case No. 04-059492-CK, June 30, 2004 Temporary Restraining Order,

**Exhibit J**; *Intertec Systems, L. L. C. v. NYX, Inc.*, Oakland County Circuit Court, Case No. 04-

060634-CK, August 24, 2004 Temporary Restraining Order, **Exhibit L**; *Delphi Automotive*

*Systems, Inc. v. Central Die Casting and Mfg.*, United States District Court for the Eastern

District of Michigan, Case No. 01-74034, October 26, 2001 Temporary Restraining Order,

**Exhibit M**.

> b. *Higher Raw Material Costs Do Not Constitute a Force Majeure and Therefore Do Not Excuse Fabristeel's Obligation to Perform*

Moreover, courts have consistently held that increased materials costs do not amount to a

*force majeure* excusing performance:

- "The normal risk of a fixed price term is that the market price will change . . . a *force majeure* clause interpreted to excuse the buyer from the consequences of the risk he expressly assumed would nullify a central term of the contract." *Northern Indiana Pub. Serv. Co. v. Carbon County Coal Co.*, 799 F.2d 265, 275 (7th Cir. 1986) (involving a long term fixed-price contract for the delivery of coal);

- "[If] fixed price contracts can be avoided due to fluctuation in price, then the entire purpose of fixed price contracts, which is to protect both the buyer and seller from the risks of the market, is defeated." *Langham-Hill Petroleum Inc. v. Southern Fuel Co.*, 813 F.2d 1327, 1330 (4th Cir. 1987) (rejecting force majeure claim based upon worldwide collapse in price of crude oil);

- "Ordinarily, only where a force majeure clause specifically includes the event alleged to have prevented performance, will a party be excused from performance. **This maxim is especially true where the event relied upon to avoid market performance is a market fluctuation . . . . American courts have routinely refused to excuse performance under such a theory,** even where the force majeure clause, unlike the one in question here, presents potential ambiguities." *Millers Cove Energy Co. v. Moore*, 62 F.3d 155, 158 (6th Cir. 1995) (lack of economic feasibility because of depressed coal prices does not forgive duty to mine under a contract), quoting *United States v. Pan Handle Eastern Corp.*, 693 F. Supp. 88 (Dist. Ct. Del. 1988) (economic hardships resulting

14

from market fluctuations did not constitute a force majeure relieving the parties of their obligations under contract for sale of liquefied natural gas); and

- "The force majeure clause as interpreted by defendant is repugnant to [the contract's] general purpose." *Golsen v.* ONG Western, Inc., 756 P.2d 1209, 1210 (Sup. Ct. Okla. 1988) (contractual provision excusing performance for "failure of gas supply or markets" did not excuse performance based upon market fluctuations because the inability to sell something at a profit is not what the law of force majeure is designed to protect).

In sum, courts consistently hold that higher materials costs do not equate to a *force majeure.* Fabristeel's attempt to avoid performance based upon its increased materials costs should accordingly be rejected, and Fabristeel should be compelled to continue to deliver the Parts to Fabco for the terms of the Contracts, or at least until an alternate supply can be found.

  c.  *The UCC Entitles Fabco to Have Time to Find an Alternate Supply*

Fabco has fully complied with the terms of the Contracts. Fabristeel has breached the Contracts by ceasing shipment of Parts. If Fabristeel is not required to resume shipments, Fabco will be unable to timely cover its Parts needs. Even if Fabristeel had any right to terminate electively its obligations under the Contracts, Section 2-309 of the Michigan Uniform Commercial Code entitles Fabco to a reasonable time to find an alternative supplier of Parts, which in this case is at least several months (the time necessary to resource and validate the supply of to another supplier). MCL § 440.2309 ("Termination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party and an agreement dispensing with notification is invalid if its operation would be unconscionable.").

The official comment to MCL § 440.2309 recognizes the need to provide a buyer, like Fabco, with such reasonable time to obtain an alternative supplier:

15

> Subsection (3) recognizes that the application of principles of good faith and sound commercial practice normally call for such notification of the termination of a going contract relationship as will give the other party reasonable time to seek a substitute arrangement.

Thus, Fabco should be allowed at least the several months it will take to locate and certify an alternate supply of the Parts.

In summary, Fabristeel's ostensible claims of commercial impracticability or *force majeure* based upon increased steel prices should suffer a similar fate as in the Intertec case decided by Judge Cleland of this Court on October 14, 2004 [Exhibit K], and the Oakland County Circuit Court's rejection of those claims based upon increased steel prices in *Textron* and *Center Manufacturing*. Those recent decisions join the "gale of judicial opinions" described above rejecting claims for increased materials costs as a basis for a claim of commercial impracticability and *force majeure*.

Fabristeel simply cannot re-write the Contracts, nor can it ask this Court to do so, simply because Fabristeel is experiencing the adverse effects of the very risk it decided to undertake when it agreed to a fixed-price terms in the Contracts.

Fabco has a strong likelihood of prevailing on the merits of this case and is entitled to specific performance of the Contracts under MCL § 440.2716.

## 2. Fabco Will Be Irreparably Harmed If An Injunction Is Not Issued

As the Verified Complaint and the Affidavit of Jeff Tessier detail, Fabco and GM will be irreparably harmed if the Court does not issue an injunction compelling Fabristeel to continue delivery of the Parts pursuant to the Contracts. Unless Fabristeel resumes shipments, Fabco will begin running out of the parts on Wednesday, November 3, 2004, and will be forced to stop making the Assemblies. GM maintains only a few days' worth of inventory of Fabco's

Assemblies, relying on daily shipments from Fabco.  GM will run out of Assemblies starting Monday, November 8.  **Exhibit B, ¶¶ 21-22.**

Accordingly, unless the Court grants injunctive relief, the production of Fabco, and Fabco's customer GM will be interrupted.  This will inflict irreparable harm on these companies, their employees, and all other parties in their sales and distribution chains.  Because of the far-reaching consequences to Fabco and GM and the extraordinary harm Fabristeel's misconduct will cause, the only adequate remedy is to mandate that Fabristeel continue delivering the Parts to Fabco as required by the Contracts.

This Court has recognized the gravity of harm to a buyer in the automotive industry that may result if a supplier is permitted to refuse to continue performance.  In *Kelsey-Hayes Co v. Galtaco Redlaw Castings Corp*, 749 F. Supp. 794 (E. D. Mich. 1990) (Cohn, J.), this Court recognized the type of irreparable injury that can be inflicted on a buyer in the automotive industry, if a supplier ceases to provide parts under a just-in-time requirements contract:

> It is well known that in an effort to promote efficiency, car manufacturers are reducing the size of their reserve banks.  As a result, component parts are often incorporated into a finished product within a few hours of their delivery.  **A supplier's failure to make scheduled shipments may have immediate and dramatic consequences** . . . . Thus, a breach of contract in the automotive industry may be more coercive than in other industries.

*Id.* at 798 n 7.

Also, in *re Autostyle Plastics, Inc*, 216 B.R. 784 (Bankr. W. D. Mich. 1997), the court approved extraordinary measures to avoid a shutdown of General Motors plants because it recognized the distressing consequences of cutting off a "single source" supplier for parts:

> Because [Debtor] was a "single source" supplier to General Motors Corporation (among others), it feared that any interruption in its production schedules might result in a shut Down of certain assembly lines while GM and other customers obtained new suppliers and made the necessary arrangements for new production tooling and dies.  In

17

> turn these shut Downs might cause the layoff of innumerable
> employees of GM and Debtor's other customers. ... The Debtor
> calculated that a shut Down of a GM assembly line could result in a
> damage claim by GM and an offset against outstanding GM accounts
> receivable in excess of $9 million per day.

*Id.* at 788; *see also General Motors Corp v Paramount Metal Prods Co*, 90 F. Supp. 2d 861, 875

(E. D. Mich. 2000) (citing testimony that "GMC would have lost millions of dollars per day if

Paramount immediately ceased production of the plaintiffs' seat frame requirement").

As in the *Kelsey-Hayes, Autostyle Plastics,* and *Paramount Metal Products* cases, if

Fabristeel is permitted to cut off its supply of the Parts to Fabco in flagrant breach of the

Contracts, Fabco and GM face the immediate and dire consequences of plant shutdowns.

### 3.   The Injunction Will Preserve the Status Quo and Will Not Injure Fabristeel

The damage to Fabco if an injunction is not issued will significantly outweigh any harm

suffered by Fabristeel.   As detailed above, Fabco and GM will suffer significant harm if

Fabristeel is not compelled to perform its contractual obligations.   On the other hand, Fabristeel

will suffer no harm by being ordered to perform its contractual obligations.   The requested

injunction would merely require Fabristeel to do what it has been doing since January 27, 1996 –

supply the Parts at fixed prices as set out in the Contracts.   Fabristeel has demanded price

increases for the Parts; but Fabristeel is not legally injured simply because it is required to

perform the Contracts it entered into, even if the cost of raw materials has increased and the

Contracts are no longer as profitable to Fabristeel.

Moreover, any arguable harm that Fabristeel would sustain from specific performance, if

it could somehow prevail on the merits, would be easily remedied through money damages.   The

balance of hardships tips decidedly in favor of Fabco: it, along with GM, faces the shutdown of

their factories and catastrophic irreparable losses, while Fabristeel risks only the loss of a

percentage of its profits.   *See, e.g.*, *Zurn Constructors, Inc. v. BF Goodrich Co*, 685 F. Supp.

1172, 1182 (D. Kan. 1988) (granting preliminary injunction of specific performance to buyer of PVC compound where "plaintiff's potential loss of its entire business decidedly outweighs defendant's potential lost profits and its being forced to alter its corporate strategy"); *Kaiser Trading Co. v. Associated Metals & Minerals Corp*, 321 F. Supp. 923, 934 (N. D. Cal. 1970) (granting preliminary injunction of specific performance to buyer of compound used to make aluminum where "even if [Defendant] were to prevail ultimately on the merits by justifying its repudiation of the contract, the probability of which is not substantial, it could be recompensed adequately in money damages").

Viewed realistically, an order enjoining Fabristeel to resume delivery of the Parts pursuant to the Contracts will not injure Fabristeel; it would merely preserve the status quo by compelling Fabristeel to honor its obligations under the Contracts.

  **4.**  **Granting the Injunction is in the Public Interest**

The fourth and last factor to be examined before issuing injunctive relief is the public interest. Here, the public interest will be served by granting the requested injunctive relief since it will prevent a shutdown of manufacturing facilities of Fabco, GM, and scores of their suppliers, together with the consequent layoffs and other harm to the local, state and national economy that would ensue. Moreover, there is a distinct public interest in having parties comply with and satisfy the terms of their contracts. The Court should therefore issue a mandatory injunction compelling Fabristeel's performance under the Contracts.

## CONCLUSION

For the foregoing reasons, Fabco is entitled to a preliminary injunction compelling Fabristeel to continue delivery of the Parts pursuant to the Contracts.

WHEREFORE, Fabco requests that the Court grant its Motion for Preliminary Injunction, pursuant to Fed. R. Civ. P. 65, ordering as follows:

(a)    Preliminary injunctive relief preventing Fabristeel from taking any action inconsistent with its supply obligations to Fabco under the Contracts;

(b)    Preliminary injunctive relief requiring Fabristeel to supply Fabco with sufficient quantities of the Parts to satisfy Fabco's requirements under the Contracts, without the condition that Fabco pay surcharges or other charges that exceed the prices specified in the parties' Contracts, until such time as sufficient production volumes of quality (validated) substitute Parts are obtained; and

(c)    Such other relief as the Court may deem just, equitable or appropriate in these circumstances.

Respectfully submitted,

BUTZEL LONG

By:    _Eric M. Mathis_
       Daniel N. Sharkey (P53837)
       Eric M. Mathis (P65384)
150 West Jefferson, Suite 100
Detroit, MI  48226
Attorneys for Plaintiff ThyssenKrupp Fabco Inc.

Dated:  October 29, 2004
706102

20